UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Gregory R. Russell,

              Plaintiff,

   vs.

Michael J. Astrue,
Commissioner of Social
Security,

              Defendant.         Civ. No. 07-4202 (RHK/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I. Introduction

The Plaintiff commenced this action, pursuant to Section 205(g) of the Social

Security Act, Title 42 U.S.C. §405(g), seeking a judicial review of the

Commissioner's final decision which denied his application for Disability Insurance

Benefits ("DIB"), and Supplemental Security Income ("SSI"). The matter is now

before the Court upon the parties' cross-Motions for Summary Judgment. The

Plaintiff appears by Edward C. Olson, Esq., and the Defendant appears by Lonnie F.

Bryan, Assistant United States Attorney. For reasons which follow, we recommend

that the Plaintiff's Motion for Summary Judgment be denied, and that the Defendant's Motion be granted.

## II. Procedural History

The Plaintiff first applied for DIB and SSI on June 30, 2004, at which time, he alleged that he had become disabled on December 1, 2000. [T. 35, 37]. However, at his Administrative Hearing, the Plaintiff amended his alleged onset date of disability to January 23, 2003. [T. 296]. The Plaintiff met the insured status requirement at the onset date of disability, and remained insured for DIB through June 30, 2003. [T. 35].

The State Agency denied his claim on initial review, and upon reconsideration. [T. 35-48, 78-80]. The Plaintiff made a timely request for a Hearing before an Administrative Law Judge ("ALJ") and, on November 14, 2006, a Hearing was conducted, at which time, the Plaintiff appeared, and was represented by a non-attorney representative. [T. 22-30, 33, 54, 291-321]. Thereafter, on March 28, 2007, the ALJ issued a decision which denied the Plaintiff's claim for benefits. [T. 14-21]. On May 9, 2007, the Plaintiff requested an Administrative Review before the Appeals Council, [T. 9], which, on August 15, 2007, denied the request for further review. [T. 5-7]. Thus, the ALJ's determination became the final decision of the Commissioner. See, Grissom v. Barnhart, 416 F.3d 834, 836 (8th Cir. 2005); Steahr v. Apfel, 151 F.3d

1124, 1125 (8th Cir. 1998); Johnson v. Chater, 108 F.3d 942, 943-44 (8th Cir. 1997); 20 C.F.R. §§404.1581, and 416.981.

### III.  Administrative Record

A.     Factual Background.  The Plaintiff was fifty-three (53) years old at the time of the Hearing.  [T. 296].  He served in the military [T. 68], and has a high school diploma.  [T. 93].  He has past relevant work as a ride operator, machine operator, carpenter, and postal clerk.  [T. 88, 93, 99, 107-108, 118-122, 150].  The Plaintiff alleges that he cannot work due to arthritis, stomach ulcers, depression, and partial distal amputation of his left foot.  [T. 35, 38, 87].  He previously, and unsuccessfully, applied for DIB in 1993, 1994, and 1996.  [T. 63-65].

1.     Medical Records.  On October 17, 2001, the Plaintiff was admitted to the St. Cloud Veterans Administration Medical Center ("VAMC"), for acute alcohol detoxification.  [T. 158].  The Plaintiff's employer brought him to the VAMC after he missed an entire week of work.  [T. 163].  At the time of his admission, the Plaintiff reported a ten (10) per cent service-related disability, due to a leg fracture.  [T. 161].  He also reported drinking up to one (1) pint of liquor, plus three (3) to six (6) beers per day.  Id.  He denied any seizures or delirium tremens, but admitted to experiencing blackouts.  Id.  He also admitted using marijuana twice weekly.  Id.  The

Plaintiff reported that he had received one (1) past citation for driving while intoxicated, and that he had finished chemical dependency treatment in 1994. [T. 163]. He was diagnosed with alcohol and nicotine dependence, as well as episodic marijuana abuse. [T. 158]. The Plaintiff completed chemical dependency treatment, and was discharged on November 16, 2001. Id. At the time of his discharge, he was prescribed Methocarbamol,[1] and he planned to attend Alcoholics Anonymous meetings. [T. 158-160].

On February 27, 2002, the Plaintiff was seen by Mairaj Din, M.D. ("Dr. Din"), for pain in his right hip and shoulder. [T. 191]. The Plaintiff reported ongoing pain for a period of eight (8) months. Id. Dr. Din observed no swelling or tenderness in the Plaintiff's shoulder, although his hip joint was tender. Id. The Plaintiff was diagnosed with arthritis, and was prescribed Naproxen.[2] Id. On March 13, 2002, the Plaintiff was seen for a follow-up visit, owing to pain in his right hip and right shoulder. [T. 190]. An x-ray was normal, although Dr. Din observed some

---

[1]Methocarbamol is "a skeletal muscle relaxant, administered orally, intramuscularly, and intravenously." Dorland's Illustrated Medical Dictionary, at 1099 (29th Ed. 2000).

[2]Naproxen is a "nonsteroidal anti-inflammatory drug * * * with analgesic and antipyretic properties." Physician's Desk Reference, pp. 2725 (62nd Ed. 2008).

osteoarthritic changes.  [T. 190, 192].  The Plaintiff was prescribed Vioxx,[3] and Dr. Din approved him to return to work in two (2) weeks.  [T. 190].

On December 26, 2002, the Plaintiff presented at the emergency room due to abdominal pain, diarrhea, and vomiting.  [T. 217].  However, he refused to have any labwork performed.  [T. 220].  The Plaintiff was advised that no diagnosis could be made without labwork and x-ray studies, and he signed himself out of the emergency room against medical advice.  Id.

On June 29, 2003, the Plaintiff was seen at the emergency room for symptoms of nausea, vomiting, diarrhea, and mild epigastric pain.  [T. 169].  He reported a two (2) month history of malaise, anorexia, and weight loss, and he also reported drinking two (2) pints of liquor per week.  Id.  The Plaintiff reported that several of his family members had passed away in recent months.  [T. 172].  He reported losing twenty (20) pounds, because his abdominal pain made it difficult for him to eat.  Id.  The Plaintiff also reported a recent fall from his bicycle, although he denied any significant injuries from that fall.  [T. 173].  The Plaintiff stated that he rode a mountain bike on a daily

---

[3]Vioxx is indicated for the relief of the signs and symptoms of osteoarthritis, and rheumatoid arthritis in adults.  See, Physicians' Desk Reference, at 2122 (57th Ed. 2003).

basis, and that he often rode many miles.  [T. 176].  The emergency room physician observed that the Plaintiff's symptoms disclosed a "difficulty to thrive."  Id.

After testing disclosed a markedly abnormal liver function, the Plaintiff was admitted to the St. Cloud Hospital.  [T. 169].  The Plaintiff was diagnosed with alcohol and tobacco abuse, alcoholic hepatitis, depression, possible hemochromatosis, hypomagnesemia, and macrocytosis.[4]  Id.  During his hospital stay, the Plaintiff received several doses of Valium,[5] for symptoms of alcohol withdrawal. [T. 170].  He also underwent a liver biopsy, a CT scan of his abdomen and head, and an evaluation relating to his alcohol use.  [T. 179-181, 185].  The Plaintiff reported that he had been

---

[4]Hemochromatosis is a disorder which causes "tissue damage and dysfunction of the liver, pancreas, heart, and pituitary."  Dorland's Illustrated Medical Dictionary, at 801 (29th Ed. 2000).

Hypomagnesemia is "an abnormally low magnesium content of the blood plasma, usually the result of malabsorption, dehydration, alcoholism, or renal disease[.]"  Id. at 864.

Macrocytosis, or macrocythemia, is "a condition in which the erythrocytes are larger than normal, such as in macrocytic anemia and some types of liver disease."  Id. at 1044.  An erythrocyte is "one of the elements found in peripheral blood."  Id. at 618.

[5]Valium "is indicated for the management of anxiety disorders or for the short-term relief of the symptoms of anxiety."  Physicians' Desk Reference, at 2765 (62nd Ed. 2008).

through treatment on three (3) prior occasions.  Id.  He denied any legal or employment consequences due to his alcohol use.  [T. 186].  He also advised that he had been working as an apartment manager for approximately one (1) year.  Id.  A licensed social worker at the hospital recommended outpatient chemical dependency treatment, which the Plaintiff declined.  Id.

On July 3, 2003, the Plaintiff was discharged from the hospital, after his liver function showed improvement, and his magnesium level returned to normal.  [T. 169-171].  He was prescribed Ativan[6] for tremors, due to his alcohol withdrawal.  [T. 171].  A few days later, on July 8, 2003, the Plaintiff was seen by Albert Fleury, M.D. ("Dr. Fleury"), after he acquired poison oak, or poison ivy, while walking in the woods.  [T. 189].

On October 28, 2004, the Plaintiff presented at the emergency room, and complained of pain "all over," with the most acute pain in his right hip.  [T. 212].  The Plaintiff's wife reported that the Plaintiff had been self-medicating with alcohol to control his pain, including approximately a gallon of wine in two (2) to three (3) days.

_____

[6]Ativan is a trademarked preparation of lorazepam.  See, Dorland's Illustrated Medical Dictionary, at 167 (29th Ed. 2000).  Lorazepam is a benzodiazepine with anxiolytic and sedative effects," for "the treatment of anxiety disorders and short-term relief of anxiety symptoms[.]"  Id. at 1027.

[T. 213].  An x-ray of the Plaintiff's pelvis revealed only a mild degenerative change in his hip joints.  [T. 216].  He was prescribed Ativan, Celebrex, and Glucosamine,[7] and was discharged the same day.  [T. 215].

On November 3, 2004, the Plaintiff was seen by Michael Butner, M.D. ("Dr. Butner"), for his low back and hip pain.  [T. 275].  He was then taking Lorazepam, but was seeking a sleep aid, due to his chronic pain.  Id.  Dr. Butner observed that the Plaintiff was "fairly unkempt," with tenderness in his hips.  Id.  A review of the Plaintiff's x-rays disclosed mild to moderate degenerative arthritis, and Dr. Butner prescribed Amitriptyline[8] and Celebrex, for management of chronic pain.  Id.

On November 17, 2004, the Plaintiff was seen by Dr. Butner, for assistance with his disability forms.  [T. 274].  Dr. Butner observed that the Plaintiff was ambulating well, with normal joint mobility and adequate strength.  Id.  In addition, the Plaintiff's lab results were all within normal limits.  [T. 281].  Dr. Butner stated

---

[7]Celebrex is indicated for the "relief of the signs and symptoms of osteoarthritis."  Physician's Desk Reference, p. 3066 (62nd Ed. 2008).  Glucosamine is "the amino sugar derivative of glucose[.]"  Id. at 755.

[8]Amitriptyline hydrochloride is "a tricyclic antidepressant * * * also having sedative effects[.]"  Dorland's Illustrated Medical Dictionary, at 62 (29th Ed. 2000).

that the Plaintiff's symptoms "seem to be greater than his physical exam would indicate." [T. 274].

On November 19, 2004, Dr. Butner provided a medical opinion, based upon his treatment of the Plaintiff. [T. 222]. Dr. Butner opined that the Plaintiff was able to perform limited employment, with no heavy lifting or protracted walking or standing, due to his degenerative arthritis, and his partially amputated left foot. Id. Dr. Butner also concluded that the Plaintiff did not suffer from any mental illness, developmental disability, learning disability, or chemical dependency. Id.

On January 25, 2005, the Plaintiff was seen by Dr. Butner, after he experienced leg swelling. [T. 273]. Dr. Butner observed that the Plaintiff had been using over-the-counter, non-steroidal medications for his arthritic pain, which could cause fluid retention. [T. 273]. Dr. Butner prescribed Lasix[9] and Tylenol, and advised the Plaintiff to stop taking non-steroidal medications. [T. 272-273]. On February 18, 2005, the Plaintiff was seen for a follow-up visit, at which time Dr. Butner prescribed

---

[9]Lasix is a trademark for preparations of furosemide. See, Dorland's Illustrated Medical Dictionary, at 964 (29th Ed. 2000). Furosemide is "a loop diuretic used in the treatment of edema associated with congestive heart failure or hepatic or renal disease and in the treatment of hypertension * * * ." Id. at 718.

Celebrex and Ultram,[10] and referred the Plaintiff for a bone density scan.  [T. 270].

On February 25, 2005, the Plaintiff underwent the scan, which disclosed that his bone

density was in the low normal range, with moderate risk of fracture.  [T. 263].  At a

follow-up visit on March 4, 2005, the Plaintiff was prescribed Fosamax[11] to manage

his osteoporosis, and was continued on Ultram for his osteoarthritic pain.  [T. 268,

270].  Dr. Butner continually advised the Plaintiff to quit smoking, in order to promote

normal bone health.  [T. 269-275].

On July 8, 2005, the Plaintiff was admitted to the hospital for pharyngitis with

laryngeal edema.[12]  [T. 254].  He was prescribed Cleocin and Zithromax,[13] and was

---

[10]Ultram is a trademarked preparation of tramadol hydrochloride.  See, Dorland's Illustrated Medical Dictionary, at 1909 (29th Ed. 2000). Tramadol hydrochloride is "an opioid analgesic used for the treatment of moderate to moderately severe pain[.]"  Id. at 1862.

[11]Fosamax is indicated as "[t]reatment to increase bone mass in men with osteoporosis." Physician's Desk Reference, p. 1978 (62nd Ed. 2008).

[12]Pharyngitis is an "inflammation of the pharynx," also known as a sore throat. Dorland's Illustrated Medical Dictionary, at 1367 (29th Ed. 2000).

[13]Cleocin is a trademark for preparations of clindamycin.  See, Dorland's Illustrated Medical Dictionary, at 363 (29th Ed. 2000).  Clindamycin is "effective primarily against gram-positive bacteria."  Id. at 363-364.

Zithromax is a trademark for preparations of azithromycin.  Id. at 1997. Azithromycin is an "azalide antibiotic, derived from erythromycin," which is "used in the treatment of mild to moderate infections caused by susceptible organisms * *

administered Lortab[14] and Morphine for pain in his chest.  Id.  On July 10, 2005, he was discharged, after his pharyngitis had resolved.  Id.  At a follow-up visit on August 5, 2005, the Plaintiff's condition had improved, although he continued to smoke despite his physician's warnings.  [T. 264].

On December 27, 2005, the Plaintiff was prescribed a Duragesic patch.[15]  [T. 287].  On February 22, 2006, the Plaintiff was seen by Dr. Butner for a follow-up visit, and he reported that his pain had radiated into his right groin, which Dr. Butner observed was consistent with degenerative changes.  [T. 286].  Dr. Butner continued the Plaintiff's prescriptions for Duragesic and Fosamax, and he also prescribed Cymbalta[16] for better pain control.  Id.

At a follow-up visit on March 8, 2006, the Plaintiff reported remarkable improvement, with fewer sleep disturbances, and a lessened need for narcotics.  [T.

---

* ."  Id. at 181.

[14]Lortab is "indicated for the relief of moderate to moderately severe pain." Physician's Desk Reference, at 3259 (62nd Ed. 2008).

[15]Duragesic is a "transdermal system," which is "indicated for management of **persistent,** moderate to severe chronic pain[.]"  Physician's Desk Reference, at 2352-2353 (62nd Ed. 2008)[emphasis in original].

[16]Cymbalta is indicated for the treatment of major depressive disorder, for the management of neuropathic pain, and for the treatment of generalized anxiety disorder.  See, Physician's Desk Reference, at 1793 (62nd Ed. 2008).

285].  At a follow-up visit on March 22, 2006, the Plaintiff reported some fears about the medication, but Dr. Butner noted that the Plaintiff's "pain perception seems to be improved."  [T. 284].  Dr. Butner strongly counseled the Plaintiff to quit smoking, given the negative impact of that habit on his underlying health problems.  Id.  On May 8, 2006, the Plaintiff's wife expressed her concern that the Plaintiff was then drinking a case of beer every two (2) to three (3) days, and that he had stopped using the Duragesic patches.  Id.  Although the Plaintiff failed to appear at his next follow-up visit, his wife later called to Dr. Butner's office to renew his prescription for Duragesic.  Id.

In a letter dated November 10, 2006, Dr. Butner opined that the Plaintiff was totally disabled, due to his degenerative arthritis, except for his ability to care for his personal needs.  [T. 288].  Dr. Butner reported that the Plaintiff had required chronic opiate use for chronic pain syndrome, due to his arthritis and his difficulties with his gait.  Id.  In addition, Dr. Butner reported that the Plaintiff would likely suffer chronic obstructive pulmonary disease, due to his smoking habit.  Id.  As of the date of his letter, Dr. Butner had last seen the Plaintiff on March 22, 2006.  Id.

2.      Evaluations.  On August 24, 2004, the Plaintiff was seen by Jack B. Greene, M.D. ("Dr. Greene"), for an orthopedic consultative examination, in

connection with his application for benefits.  [T. 193].  The Plaintiff reported stable pain in his left foot, and in his right hip, which radiated up his back and down his right leg.  Id.  The Plaintiff explained that his left foot had been partially amputated in 1993, after it was crushed in a workplace accident.  Id.  The Plaintiff stated that he was not receiving any current medical care, but that he was taking aspirin or Ibuprofen for pain.  Id.  Upon examination, Dr. Greene observed mild tenderness in the Plaintiff's right lower neck, and pain upon movement of the Plaintiff's neck.  Id.  However, he found no abnormality in the Plaintiff's shoulders, elbows, or wrists, and the Plaintiff's fine finger manipulation, pinch and grip strength, and dexterity were within normal limits.  Id.

Dr. Greene observed some tenderness upon examining the Plaintiff's hips, although his range of motion was normal, and the Plaintiff did not report any pain with his hip movements.  [T. 194].  Dr. Greene noted that the Plaintiff's left foot had healed well after his amputation, and his ankle motion was within normal limits.  Id. The Plaintiff did not make use of any cane, or other assistive device to walk, although he reported using a cane at home.  Id.  The Plaintiff was able to get up from a chair and descend from the examination table with minimal difficulty, and he was able to reach overhead without difficulty.  Id.  Dr. Greene observed that the Plaintiff was not

able to walk on his heels and toes, but noted that the Plaintiff had adequate grasping ability.  Id.

Dr. Greene concluded that the Plaintiff suffered pain in his upper leg and right buttock, because of his need to limp on his partially amputated left foot.  Id.  He felt that the Plaintiff's pain would remain stable for the near future, although it might worsen with advanced age.  Id.  Dr. Greene concluded that the Plaintiff was able to walk for fifteen (15) minutes out of an eight (8) hour workday, and that he could sit for eight (8) hours, with the ability to manipulate objects or hand controls.  Id.  However, Dr. Greene stated that the Plaintiff should not be required to climb a ladder or stairs, work on scaffolding, or work around dangerous machinery.  Id.

On September 28, 2004, Cliff Phibbs, M.D. ("Dr. Phibbs"), who is a State Agency consultant, assessed the Plaintiff's residual functional capacity. [T. 237].  Dr. Phibbs observed that the Plaintiff had been able to continue working as a carpenter, after his 1993 work accident.  [T. 238].  Accordingly, Dr. Phibbs found that the Plaintiff was able to frequently lift twenty-five (25) pounds, and occasionally lift fifty (50) pounds.  Id.  He further found that the Plaintiff could stand, walk, or sit, for six (6) hours out of a normal work day, although the Plaintiff was limited in his ability to push and pull with his lower extremities, due to the partial amputation of his left foot.

Id. Dr. Phibbs also concluded that the Plaintiff should never be required to climb a ladder, rope, or scaffolding. [T. 239].

However, he found no limitations in the Plaintiff's ability to manipulate or reach, nor did he find any limitations in the Plaintiff's ability to communicate. [T. 240-241]. Dr. Phibbs concluded that the Plaintiff's alleged symptoms were not disabling, nor were they proportionate to the Plaintiff's medically determinable impairments. [T. 242]. Despite the Plaintiff's claim that his symptoms had worsened, Dr. Phibbs noted that examinations, in November of 2004, had not disclosed any significant change in his condition. [T. 252]. Dr. Phibbs' findings were reviewed, and affirmed by Aaron Mark, M.D. ("Dr. Mark"), who is also a State Agency consultant. [T. 244, 252].

On October 4, 2004, the Plaintiff was seen by Steven Carter, Psy.D. ("Dr. Carter"), for a consultative examination relating to his depression. [T. 201]. The Plaintiff reported that his wife had driven him to the appointment, because he had not held a driver's license in ten (10) years. Id. The Plaintiff advised Dr. Carter that he had let his license expire, because "he found people's driving too annoying to tolerate." Id. The Plaintiff also reported that he suffered from arthritis and was immobile due to his partially amputated left foot, and that he occasionally experienced

depression.  Id.  The Plaintiff stated that, after his accident in 1993, he left the hospital early, and returned to work at two (2) jobs.  Id.  However, within six (6) months, the pain in his left foot had worsened, and he ultimately stopped working.  Id.

The Plaintiff stated that, in the years since his accident, he had consulted with only two (2) physicians, and he had never consulted a pain specialist.  [T. 201-202]. Dr. Carter noted that the Plaintiff "voiced an unusual reluctance to consult with physicians."  [T. 201].  The Plaintiff advised that he disliked pills, but took aspirin or acetaminophen on his own.  [T. 202].  The Plaintiff also advised that he stopped taking his prescribed arthritis medication because it "made him grumpy."  Id.  The Plaintiff reported using a cane at home, although not in public, and he stated that he falls, approximately once per month, when his right hip "goes out," although he denied any resultant injuries.  [T. 202-203].  The Plaintiff advised that his depression had started five (5) years earlier, with no known precipitant.  [T. 202].  The Plaintiff denied receiving any treatment for his depression, and stated that, "I feel like I can handle it myself."  Id.  According to the Plaintiff, his depressive episodes occur every few weeks, and he is able to "snap out of it" if he is left alone for five (5) or six (6) hours.  Id.  The Plaintiff also reported that he avoided going to bed, due to recurrent nightmares over his accident.  [T. 206].

- 16 -

The Plaintiff informed Dr. Carter that he lived with his wife and her adult grandson.  Id.  He also reported that he did not require any assistance to feed himself, care for his personal hygiene, dress, or take his medications.  [T. 202-203].  The Plaintiff reported a dislike of the telephone, although Dr. Carter observed that "[t]his does not appear related to his disability claim."  [T. 203].  The Plaintiff also stated that he performed all of the household chores, including dusting, weekly vacuuming, cleaning the bathrooms, washing dishes, washing and folding clothes, performing minor household repairs, caring for the family's cats, cooking meals, and shopping for groceries.  [T. 203, 206].  The Plaintiff also reported that he mowed the lawn approximately once per month, and was able to shovel snow for ten (10) to fifteen (15) minutes at a time.  [T. 203].

The Plaintiff informed Dr. Carter that he was no longer able to ride his bike, due to cramps in his hips, nor was he able to fish, bowl, water ski, or engage in his crafting hobbies, due to his physical disabilities.  [T. 204].  With respect to his other activities, the Plaintiff reported listening to music, watching television, playing cards, and reading.  Id.  However, the Plaintiff stated that he no longer attended parties or concerts because he could not tolerate crowds.  [T. 204-205].

With respect to his relationships, the Plaintiff advised that he had a happy second marriage, that he was close to his siblings, that he saw several friends regularly, and that he had no difficulty in getting along with others. [T. 205]. However, he did not have contact with his four (4) daughters, due to conflicts with his ex-wife. Id. With respect to alcohol use, the Plaintiff reported drinking four (4) to five (5) beers approximately twice per month. Id. He acknowledged a history of problems with his alcohol use, but stated that he did not consider himself alcohol-dependent. Id.

Dr. Carter observed that the Plaintiff was pleasant, cooperative, and friendly, throughout the examination. [T. 206]. The Plaintiff's speech was fluent, his thoughts were coherent and logical, and the Plaintiff had no difficulty with understanding. Id. The Plaintiff denied any obsessive thoughts or hallucinations, [T. 206-207], and further denied any prolonged periods of sadness or anxiety, for more than a few hours at a time. Id. Despite his dislike of crowds, and his recurrent nightmares, the Plaintiff denied any symptoms of post-traumatic stress disorder. Id.

Dr. Carter concluded that the Plaintiff did not meet the diagnostic criteria for any mood or anxiety disorder, although he diagnosed a nightmare disorder. Id. Dr. Carter also observed that the Plaintiff was well-oriented, with a good attention span,

and adequate recall, although his abstract reasoning was "surprisingly poor." Id.

Ultimately, Dr. Carter concluded that the Plaintiff suffered a mild limitation in his

ability to work, due to psychological concerns, but only with respect to his capacity

for sustaining reasonable pace and persistence, on entry-level work tasks.  [T. 208].

On December 4, 2004, James M. Alsdurf, Ph.D., L.P. ("Dr. Alsdurf"), reviewed

the Plaintiff's file, following his application for benefits, but found no medically

determinable impairment.  [T. 223].  Dr. Alsdurf's findings were reviewed and

affirmed by R. Owen Nelson, Ph.D., L.P. ("Dr. Nelson"), who is a State Agency

consultant.  [T. 235].

3.    Other Records.  In a Disability Report dated June 24, 2004, the

Plaintiff reported that his disabilities included arthritis, depression, stomach ulcers,

and a partially amputated left foot.  [T. 87].  In an interview with a Social Security

Administration representative, which related to his application for benefits, the

Plaintiff did not demonstrate any difficulty with hearing, reading, understanding,

concentration, or speech.  [T. 97].  The Plaintiff reported that he had difficulty

sleeping, suffered constant pain, was unable to stand, and had poor balance.  [T. 87].

The Plaintiff further reported that his disabilities first bothered him on September 19,

1993, following the work accident in Arkansas, which resulted in the partial

- 19 -

amputation of his left foot.  [T. 87, 95].  Following that accident, the Plaintiff began

missing work, despite a change to lighter duties, and ultimately, he stopped working

on December 1, 2000, due to his constant pain and his inability to sleep.  [T. 87, 106].

During his work as a construction laborer, the Plaintiff used tools, and frequently

lifted fifty (50) pounds, while occasionally lifting one hundred (100) pounds.  [T. 88].

In addition, during his workday, he was required to walk, stand, climb, stoop, kneel,

and crouch regularly.  Id.

In an Activities of Daily Living Report dated August 3, 2004, the Plaintiff

stated that, prior to his disabilities, he enjoyed hiking, riding his bike, and fishing.  [T.

112].  However, the Plaintiff reported that his disabilities had impacted upon his

balance and his memory, and he reported difficulty in standing, climbing stairs, or

walking more than one (1) block.  [T. 112-113].  The Plaintiff stated that he was able

to care for his personal hygiene, and to perform household chores, including cooking,

cleaning, washing dishes and laundry, and making his bed, with breaks in between,

but he stated that he performed very little yard work.  [T. 113].  The Plaintiff reported

that he lived with his wife, and that she carried the laundry baskets, drove, and did the

shopping.  Id.

The Plaintiff reported that he had no trouble getting along with others, including his family members, although he stated that he did not have any close friends.  [T. 113-114].  The Plaintiff also stated that he was able to go out in public weekly, without assistance, although crowds made him nervous.  [T. 114].  The Plaintiff reported no difficulty with either drugs or alcohol.  Id.  The Plaintiff reported watching television, playing cards, and walking on a daily basis, and visiting friends and neighbors on a weekly basis.  [T. 115].  The Plaintiff reported difficulty with standing or writing for long periods of time, and he stated that he required assistance to shower, to get out of bed, and to climb stairs.  [T. 116].  He also stated that he was unable to work because he had no balance.  [T. 117].

In a Work History Report dated August 13, 2004, the Plaintiff reported that, in 1999, he was employed as a ride operator.  [T. 118].  He cared for and operated the machine, and took tickets.  [T. 119].  The position required him to stand for eight (8) hours per day, and to walk, climb, stoop, crouch, and reach.  Id.  He also frequently lifted eighty (80) pounds, and occasionally lifted two hundred (200) pounds.  Id.  In 1996 and 1998, the Plaintiff also worked as a machine operator.  [T. 118].  In that position, he was required to stand for six (6) hours per day, and to stoop, crouch, and reach.  [T. 120].  From 1990 to 1997, the Plaintiff worked as a carpenter.  [T. 118].

In that position, he was required to stand for four (4) hours per day, and to walk, climb, kneel, crouch, crawl, and reach. [T. 121]. He also lifted twenty-five (25) pounds frequently, and one hundred (100) pounds occasionally. Id. The Plaintiff also reported working as a postal clerk, which involved sorting mail and taping packages. [T. 122]. He regularly lifted five (5) pounds, and occasionally lifted fifty (50) pounds. Id. In that position, the Plaintiff was required to walk or stand for nine (9) hours per day, and to crouch, reach, and stoop regularly. Id.

In a subsequent Disability Report, which is dated December 9, 2004, the Plaintiff reported that, since August 15, 2004, his arthritis had worsened, and that Dr. Butner had directed him to avoid lifting, and to avoid standing or walking for long periods of time. [T. 126-127]. The Plaintiff also reported that, in October of 2004, he visited the emergency room due to extreme pain, which rendered him unable to stand on his leg. [T. 128]. The Plaintiff was prescribed Celebrex and Glucosamine for his arthritis, as well as Amitriptyline as a sleeping aid. [T. 129]. The Plaintiff also reported that he was frustrated with his inability to engage in any activities, such as fishing. [T. 130].

In another Disability Report, which is dated February 22, 2005, the Plaintiff reported that the pain in his right hip had increased since December 25, 2004. [T.

141].  Dr. Butner prescribed Tramadol,[17] and scheduled a bone density scan.  [T. 142, 144].  The Plaintiff stated that he had difficulty sleeping, and that he was unable to exercise or leave his home, because his pain impacted his mobility.  [T. 145].

B.      Hearing Testimony.  The Hearing on November 14, 2006, commenced with some opening remarks by the ALJ, in which he noted the appearance of the parties for the Record.  [T. 293].  The ALJ asked the Plaintiff's lay representative if he had any objections to the evidence being introduced into the Record, and the Plaintiff's representative stated that he did not.  [T. 294].  However, the Plaintiff's representative advised that the Plaintiff sought to amend the alleged onset date of his disability to January 23, 2003.  [T. 296].  In addition, the Plaintiff's representative made some opening remarks, in which he stated that the Plaintiff suffered from asthma, arthritis in his back, knees, and hips, and a partially amputated left foot.  Id.

The ALJ then swore the Plaintiff to testify, and began his questions by asking about the Plaintiff's physical impairments.  [T. 297].  The Plaintiff confirmed that his left foot was partially amputated in 1993, when the front part of his foot was run over by a tractor.  Id.  The Plaintiff testified that his stride had been shortened as a result

---

[17]Tramadol hydrochloride is "an opioid analgesic used for the treatment of moderate to moderately severe pain[.]"  Dorland's Illustrated Medical Dictionary, at 1862 (29th Ed. 2000).

of that injury.  Id.  The Plaintiff also testified that he had been using a cane for approximately three (3) years, in part because of his left foot, and in part because of his hip pain.  [T. 298].  The Plaintiff further testified that he seldom drove, because his hip pain precluded him from keeping his foot on the pedals.  [T. 300].

The Plaintiff further testified that he had finished high school, but had no additional training or education.  [T. 299].  He confirmed that his wife worked full-time outside of the home, and that none of his children lived with them.  Id.  The Plaintiff stated that he has been receiving disability income, from the Veterans Administration since 1972, due to a broken leg that he suffered during his military service.  [T. 300].  The Plaintiff stated that he has been unable to quit smoking, but that he has reduced his cigarette use to three-quarters of a pack per day.  [T. 300-301].  He also reported drinking beer approximately twice per week and, upon questioning by the ALJ, the Plaintiff acknowledged that he drank a case of beer every two (2) to three (3) days.  [T. 301].

When the ALJ asked the Plaintiff if his pain syndrome had improved, the Plaintiff replied that his pain level changed daily.  [T. 302].  The Plaintiff denied suffering any fractures as a result of his osteoporosis, id., and he attested that he was taking Celebrex, rather than Fosamax, for his osteoporosis.  [T. 303].  The Plaintiff

testified that he was only able to walk for ten (10) minutes out of an hour, due to his hip pain.  [T. 303-304].  He acknowledged that his physicians had not recommended hip replacement, or any other surgery, as a form of treatment.  [T. 304].

The Plaintiff denied any hospitalization for depression, or any other psychiatric illness, and he further denied taking any medication for his mental health concerns.  [T. 305].  He testified that he has received two (2) citations for driving while intoxicated, that he "never bothered" to get his driver's license back after those violations, but that he completed chemical dependency treatment.  Id.  The Plaintiff also testified that he was able to care for himself, including bathing, dressing, and eating.  [T. 306].  The Plaintiff denied any full-time employment since December of 2000.  [T. 313].

The Plaintiff's representative then initiated his examination of the Plaintiff by asking about his current medications.  [T. 306].  The Plaintiff testified that he was then taking Celebrex, Duragesic patches, Singulair,[18] and calcium supplements, with no resultant side-effects.  Id.  The Plaintiff also attested that he suffered from asthma daily, but not due to any reaction with his pain medications.  Id.

---

[18]Singulair is "indicated for the prophylaxis and chronic treatment of asthma in adults * * * ."  Dorland's Illustrated Medical Dictionary, at 2094 (29th Ed. 2000).

The Plaintiff testified that he walked with a limp, and at a slow pace. [T. 306-307]. He attested that, after his accident in 1993, he took two (2) years off from working, and then attempted to return to carpentry. [T. 307]. However, the Plaintiff testified that he was not mobile enough to perform the work. [T. 308]. Instead, he took a job at a factory, but was unable to walk and stand in order to perform the job. Id.

The Plaintiff stated that he continued to experience nightmares relating to his accident, although less frequently. Id. He denied making any workers' compensation claim for his left foot injury. Id. The Plaintiff testified that he suffered from cramps and soreness in his left wrist, which affected his ability to grasp. [T. 309]. The ALJ then asked the Plaintiff if he experienced hip pain on a daily basis, and the Plaintiff confirmed that he did. Id. The Plaintiff also testified that his pain medication did not ease his hip pain, and he stated that he had more trouble from his hip than from his left foot. [T. 310].

The ALJ then swore the Vocational Expert ("VE") to testify, and confirmed that the VE had reviewed the Record, and that he was familiar with jobs within the State of Minnesota. [T. 310-311]. The Plaintiff's representative advised that he had no objection to the VE's qualifications. [T. 311].

The VE then asked the Plaintiff several questions concerning his past work as a postal clerk.  Id.  The Plaintiff testified that he worked for the post office over the course of approximately eighteen (18) months, for twenty (20) hours per week, earning $12.00 per hour.  [T. 311-312].  The Plaintiff stated that he operated the front register and sorted mail, but did not operate any office equipment, computers, or keyboards.  Id.  Based upon the Plaintiff's testimony, the VE advised that his work experience at the post office was a light-duty, semi-skilled position, which might not constitute significant employment, given that the Plaintiff worked on a part-time basis.  [T. 313].  The ALJ advised that the Plaintiff's position could be considered as past work, given his earnings in that position.  [T. 314].  The VE testified, however, that the Plaintiff did not have relevant work experience with operating office equipment, and so was limited to semi-skilled work.  Id.

The ALJ then posed a hypothetical to the VE, in which he was asked to assume a male individual, with a high school education, between the ages of forty-seven (47) and fifty-three (53), who was diagnosed with degenerative arthritis of the hip, and a nightmare disorder, with pain in the hip and right groin requiring the use of a cane, and precluding any heavy lifting or protracted walking or standing.  [T. 315].  The ALJ asked the VE to limit the individual to lifting twenty (20) pounds occasionally,

and ten (10) pounds frequently, and standing no more than twenty (20) to thirty (30) minutes before a position change, in an environment free of dust, fumes, gases, smoke, alcohol, or drugs.  [T. 315-316].   The ALJ then asked the VE if that hypothetical individual could perform the Plaintiff's previous relevant work. [T. 316]. The VE responded that the individual could not perform any of the Plaintiff's past relevant work, given that a postal clerk would be required to stand for most of the day, with only occasional sitting, and since a ride operator would work outside around dust and fumes.  Id.  The VE further stated that the Plaintiff's past relevant work did not include any transferable skills.  [T. 317].

The ALJ then asked the VE if there were other jobs in the regional economy, which could be performed by an individual with those limitations.  Id.  The VE explained that the individual could perform unskilled work as a bander/cellophaner, wrapping machine operator, or poly-packer/heat sealer, of which 8,000 such positions existed in the State of Minnesota.  [T. 318].  According to the VE, the Plaintiff would be required to lift substantially less than twenty (20) pounds, with a sit/stand option. Id.  The ALJ then amended the hypothetical, in order to ask the VE if the individual could perform those jobs if he were restricted to simple, unskilled, entry-level tasks, was precluded from any power gripping on the left side due to left wrist pain and

carpal tunnel symptoms, and was also precluded from walking on uneven surfaces or climbing.  [T. 318-319].  The VE testified that the individual would still be capable of performing those jobs.  Id.

The Plaintiff's representative then examined the VE, and asked him to describe the work level of a person who was limited to standing only fifteen (15) minutes out of an eight (8) hour workday, or to standing only ten (10) minutes out of every hour, and the VE described those limitations as sedentary work, rather than light-duty work. [T. 319-320].  The ALJ then concluded the Hearing.  [T. 321].

C.   The ALJ's Decision.  The ALJ issued his decision on March 28, 2007.  [T. 14-21].  As he was required to do, the ALJ applied the sequential, five-step analytical process that is prescribed by Title 20 C.F.R. §§404.1520, and 416.920.[19]

_____

[19]Under the five-step sequential process, the ALJ analyzes the evidence as follows:

> (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that

At the first step, the ALJ found that the Plaintiff had not engaged in substantial gainful activity since his amended alleged onset date of January 23, 2003. [T. 16]. He also observed that the Plaintiff met the insured status requirements through June 30, 2003. Id.

Next, the ALJ examined whether the Plaintiff was subject to any severe physical impairments, which would substantially compromise his ability to engage in work activity. Id. After considering the Plaintiff's medical history, which included the Plaintiff's self-reported history, the consultative psychological examination of October of 2004, and the assessment of the non-examining State Agency psychologist, the ALJ found that the Plaintiff was severely impaired by alcohol dependence, hip pain, osteoporosis, and residuals of partial left foot amputation. [T. 16-17]. The ALJ observed that the Plaintiff's other physical conditions, including his pharyngitis, had resolved quickly with medical treatment. Id.

---

there are other jobs in the national economy that the claimant can perform.

Simmons v. Massanari, 264 F.3d 751, 754-55 (8th Cir. 2001).

A claimant is disabled only if he is not engaged in substantial gainful activity; he has an impairment that limits his ability to perform basic work activities; and his impairment is either presumptively disabling, or he does not have the residual functional capacity to perform his previous work, and he cannot perform other work existing in the national economy. Id. at 754.

As to the Plaintiff's alleged mental impairments, the ALJ discussed the signs, symptoms, and other medical findings, which established the existence of a mental impairment, and evaluated them under the required procedure. See, 20 C.F.R. §§404.1520a and 416.920(a). The four (4) broad areas, which are relevant to the ability to work, are:  activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. The ALJ acknowledged that the Plaintiff had alleged depression and nightmares, but he concluded that those conditions were not severely disabling. [T. 16-17]. In particular, the ALJ noted that the Plaintiff reported depression lasting only five (5) to six (6) hours, without any psychiatric care or medication, and without any extended episodes of decompensation, and he further noted the Plaintiff's testimony, in which he stated that he only occasionally suffered from nightmares. Id.

The ALJ also observed that the Plaintiff was able to perform all of the household chores, that he got along well with others, and that Dr. Carter's examination had revealed full orientation with a good attention span, and intact memory. [T. 17]. In addition, the ALJ noted that Dr. Carter had assessed the Plaintiff's mental functioning, and found minimal or no symptoms of depression. Id. Accordingly, the ALJ found that the Plaintiff's mental impairments resulted in only

mild restrictions in his activities of daily living, social functioning, and ability to maintain concentration, persistence, and pace. Id. In reaching his conclusion, the ALJ relied upon the evaluation of Dr. Carter, who served as the consultative examiner, who had found that the Plaintiff did not suffer any impairment in his ability to understand and follow instructions, or to tolerate the stress of simple, unskilled work, and who had further found that the Plaintiff had the capacity to respond appropriately to co-workers, and to maintain concentration and persistence. Id. The ALJ also relied upon the opinion of Dr. Alsdurf, the non-examining State Agency psychologist, although he acknowledged that Dr. Alsdurf had reviewed the documentary evidence at an earlier stage of the proceedings. Id.

At the Third Step, the ALJ compared the Plaintiff's severe impairments with the impairments contained in Appendix 1, Subpart P, of the Regulations. See, Title 20 C.F.R. §404.1520(d). The ALJ determined that the Plaintiff's impairments, whether physical or mental, did not meet, or equal, the criteria of any Listed Impairment, based on the Record as a whole.[20] [T. 17].

---

[20]Although the ALJ did not fully elaborate his findings at the Third Step, the Plaintiff concedes that he did not produce evidence which would demonstrate that his impairments, whether alone or in combination, met, or equaled, the criteria of any Listed Impairment. See, Plaintiff's Memorandum in Support, Docket No. 11, at pp. 7-8.

The ALJ then proceeded to determine whether the Plaintiff retained the residual functional capacity ("RFC") to engage in the duties required by his past relevant work, or whether he was capable of engaging in other work which existed in significant numbers in the national economy. Id. RFC is defined in the Regulations as the most an individual can still do after considering the effects of physical limitations that can affect the ability to perform work-related tasks. See, Title 20 C.F.R. §404.1545, and Social Security Ruling 96-8p. The ALJ recognized that, in order to arrive at the Plaintiff's RFC, he was obligated to consider all of the symptoms, including the Plaintiff's subjective complaints of pain, and that those complaints were to be evaluated under the standard announced in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), Social Security Ruling 96-7p, and Title 20 C.F.R. §404.1529.

After considering the entire Record, including the testimony adduced at the Hearing; the opinions of the Plaintiff's treating physicians, and the consultative examiners; the objective medical evidence; and the Plaintiff's subjective complaints; the ALJ determined the Plaintiff's RFC to be as follows:

> [The Plaintiff] has the residual functional capacity to lift 20 pounds occasionally, 10 pounds frequently, requiring a sit/stand option (position change every 20-30 minutes).

> [The Plaintiff] is limited to no more than simple, unskilled
> entry-level tasks, and is totally precluded from exposure to
> dusts, fumes, gases, and smoke, in an alcohol and drug free
> setting.

[T. 17].

The ALJ concluded that the Plaintiff's impairments could reasonably be expected to produce the alleged symptoms, but he found that the Plaintiff's testimony was not credible, with respect to the intensity, persistence, and limiting effects of those symptoms.  [T. 18].

In determining the Plaintiff's RFC, the ALJ first considered the testimony of the Plaintiff, that he used a cane primarily due to his hip pain, that his pain medication did not help, but that he was able to walk for ten (10) minutes out of one (1) hour.  Id. The ALJ also observed that the Plaintiff sought treatment for his hip pain only sporadically, first in February of 2002, and then, not again, until October of 2004, and the ALJ explicitly stated that he found it "highly significant that [the Plaintiff] did not even seek any medical treatment whatsoever for his hip pain [between February of 2002 and October of 2004]."  Id.  The ALJ further observed that x-rays of the Plaintiff's right hip revealed only mild osteoarthritic and degenerative changes.  Id.

The ALJ considered the opinion of the Plaintiff's treating physician, Dr. Butner, who opined that the Plaintiff was severely disabled by degenerative arthritis and

osteoporosis.  [T. 19].  However, the ALJ found that Dr. Butner's opinion was inconsistent with his findings upon a physical examination, as well as Dr. Butner's earlier opinion that the Plaintiff was capable of working.  Id.  Notably, in November of 2004, Dr. Butner observed that the Plaintiff was ambulating well, that his alleged symptoms were inconsistent with the findings of his physical examination, and that the Plaintiff was evasive about his symptoms.  [T. 18].

In fact, the Plaintiff was never prescribed a cane or other assistive device, and Dr. Butner concluded that the Plaintiff was able to work, with restrictions only on heavy lifting and protracted sitting or standing.  [T. 19].  In addition, Dr. Butner described the Plaintiff's pain as "remarkably improved" in one of his last treatment notes.  Id.  The ALJ observed that a bone density scan showed only a moderate risk of fracture, with most results within normal limits, and he further noted that Dr. Butner mentioned only brief swelling as a specific symptom of the Plaintiff's hip pain. Id.  Accordingly, the ALJ found that the objective evidence of Record did not support Dr. Butner's conclusory opinion, or the Plaintiff's assertion of a disability.  Id.

The ALJ noted that the Record included significant evidence of the Plaintiff's history of alcohol abuse, including four (4) past treatment attempts, as well as his ongoing nicotine addiction.  Id.  He further observed that the Plaintiff had not been

compliant with his pain medications, but had been drinking heavily, at least on occasion, since October of 2004. Id. With respect to the Plaintiff's claim, that he experienced cramping and soreness in his left wrist, the ALJ noted that the Plaintiff had demonstrated the ability to grasp, and to dress, tie his shoes, and manipulate buttons without difficulty. Id.

The ALJ also discounted the opinion of Dr. Greene, the consultative examiner who opined that the Plaintiff could not walk for more than fifteen (15) minutes out of an eight (8) hour work day. Id. Again, the ALJ found that Dr. Greene's opinion was inconsistent with the clinical signs that were observed during Dr. Greene's examination of the Plaintiff in August of 2004. Id. In particular, Dr. Greene observed that the Plaintiff had a normal range of motion in his hips and ankles, that he did not require any assistive device to ambulate, and that he had normal motor strength, sensation, and deep tendon reflexes in his extremities. Id. Accordingly, the ALJ placed greater reliance upon the opinion of Dr. Phibbs, the non-examining State Agency physician who had concluded that the Plaintiff was able to perform a range of light-duty work. [T. 20].

Proceeding to the Fourth Step, the ALJ determined, based upon the VE's analysis, inclusive of the RFC that the ALJ had determined, that the Plaintiff was not

capable of performing his past relevant work as a postal clerk, ride operator, or machine operator, which are semi-skilled, light-duty positions, nor his past relevant work as a carpenter, which is a skilled, medium-duty position.  Id. In reaching that conclusion, the ALJ relied upon the testimony of the VE.  Id.

However, proceeding to the Fifth Step, the ALJ concluded that a significant number of jobs existed, in the national and regional economies, which the Plaintiff could perform.  Id.  The ALJ acknowledged that he had placed additional limitations on the Plaintiff's RFC, beyond those typically contemplated for light-duty work, but he recounted the VE's testimony, that persons who had functional limitations like the Plaintiff could work as a bander/cellophaner, wrapping machine operator, or poly-packer/heat sealer.  [T. 21].  The ALJ also noted the VE's testimony, that 8,000 such jobs existed in the economy of the State of Minnesota.  Id.  Finding the VE's testimony to be credible, and persuasive, the ALJ found that there existed a significant number of jobs that the Plaintiff could perform.  Id.  As a result, the ALJ concluded that the Plaintiff was not disabled.  Id.

IV.  Discussion

A.      Standard of Review.  The Commissioner's decision must be affirmed if it conforms to the law and is supported by substantial evidence on the Record as a whole.  See, Title 42 U.S.C. §405(g); see also, Moore ex rel. Moore v. Barnhart, 413 F.3d 718, 721 (8th Cir. 2005); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002); Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998).  This standard of review is more than a mere search for the existence of evidence supporting the Commissioner's decision.  See, Morse v. Shalala, 32 F.3d 1228, 1229 (8th Cir. 1994), citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488-91 (1951).  Rather, the substantiality of the evidence must take into account whatever fairly detracts from its weight, see, Cox v. Apfel, 160 F.3d 1203, 1206 (8th Cir. 1998); Moore ex rel. Moore v. Barnhart, supra at 721, and the notable distinction between "substantial evidence," and "substantial evidence on the record as a whole," must be observed.  See, Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998).  On review, a Court must take into consideration the weight of the evidence, apply a balancing test, and determine whether substantial evidence in the Record as a whole supports the findings of fact upon which a Plaintiff's claim was denied.  See, Loving v. Secretary of Health and Human Services,

16 F.3d 967, 969 (8th Cir. 1994); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).

Substantial evidence means more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  See, Neal ex rel. Walker v. Barnhart, 405 F.3d 685, 688 (8th Cir. 2005), citing Nelson v. Sullivan, 966 F.2d 363, 366 n.6 (8th Cir. 1992); Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001).  Stated otherwise, substantial evidence "is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006).  Therefore, "'[i]f, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the denial of benefits.'"  Vandenboom v. Barnhart, 421 F.3d 745, 749 (8th Cir. 2005), quoting Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004); Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001), quoting Mapes v. Chater, 82 F.3d 259, 262 (8th Cir. 1996).  Under this standard, we do not reverse the Commissioner even if this Court, sitting as the finder-of-fact, would have reached a contrary result.  See, Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).

Consequently, the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal on appeal.  See, Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006), citing Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); see also, Haley v. Massanari, 258 F.3d 742, 746 (8th Cir. 2001)("[A]s long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'"), quoting Holley v. Massanari, 253 F.3d 1088, 1091 (8th Cir. 2001).  Our review of the ALJ's factual determinations, therefore, is deferential, and we neither reweigh the evidence, nor review the factual record de novo.  See, Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Flynn v. Chater, 107 F.3d 617, 620 (8th Cir. 1997); Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

   B.   Legal Analysis.  In support of his Motion for Summary Judgment, the Plaintiff advances the following arguments:

- 40 -

1.      That the ALJ failed to afford the proper weight to the opinion of Dr. Greene;

2.      That the hypothetical propounded to the VE was improper; and

3.      That the VE's testimony conflicted with the Dictionary of Occupational Titles.

Plaintiff's Memorandum in Support, Docket No. 11, at 8-11.

We address each argument below.

1.      Whether the ALJ Improperly Disregarded the Opinion of Dr. Greene.

a.      Standard of Review. When a case involves medical opinion -- which is defined as "statements from physicians and psychologists or other acceptable medical sources" -- the opinion of a treating physician must be afforded substantial weight. See, 20 C.F.R. §§404.1527 and 416.927; see also, Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008); Forehand v. Barnhart, 364 F.3d 984, 986 (8th Cir. 2004); Burress v. Apfel, 141 F.3d 875, 880 (8th Cir. 1998); Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997); Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996). Nevertheless, an opinion rendered by a physician is not necessarily conclusive. See, Forehand v. Barnhart, supra at 986 ("A treating physician's opinion is generally entitled to substantial weight, although it is not conclusive and must be supported by

- 41 -

medically acceptable clinical and diagnostic data."), quoting Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998).

For example, an ALJ may discount a treating physician's medical opinion, and adopt the contrary medical opinion of a consulting physician, when the treating source's statements are conclusory, unsupported by medically acceptable clinical or diagnostic data, or when the ALJ's determination is justified by substantial evidence in the Record as a whole. See, Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997); Pena v. Chater, supra at 908; Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir. 1991); Kirby v. Sullivan, 923 F.2d 1323, 1328 (8th Cir. 1991); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986).

The opinion of a physician may also be discounted if other assessments are supported by better, or by more thorough, medical evidence. See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846. In short, the ALJ is not required to believe the opinion of a physician -- even a treating physician -- when, on balance, the medical evidence convinces him otherwise. Id. As but one example, a treating physician's opinion is not entitled to its usual substantial weight when it is, essentially, a vague, conclusory statement. See, Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996), citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991). Rather,

conclusory opinions, which are rendered by a treating physician, are not entitled to greater weight than any other physician's opinion. Id.; Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).

The Code of Federal Regulations sets forth additional factors to assist the ALJ in determining what weight should be accorded to the opinion of a given physician, including a treating physician. The Regulations encourage the ALJ to afford more weight to those opinions which are "more consistent with the record as a whole." See, 20 C.F.R. §§404.1527(d)(4) and 416.927(d)(4). More weight is also to be extended to "the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." See, 20 C.F.R. §§404.1527(d)(5) and 416.927(d)(5). When presented with a treating physician's opinion, the ALJ is obligated to examine the nature and extent of the treatment relationship, attributing weight to such an opinion that is proportionate to the knowledge that the medical provider has about the claimant's impairments. See, 20 C.F.R. §§404.1527(d)(2)(ii) and 416.927(d)(2)(ii). Further, the Regulations make clear that the opinions of treating physicians, on questions reserved for the Commissioner -- such as whether a claimant is disabled, or is unable to work -- are not

to be given any weight by the ALJ.   See, 20 C.F.R. §§404.1527(e)(1) and 416.927(e)(1).

        b.    Legal Analysis.  Here, in contrast to the usual challenge, the Plaintiff contends that the ALJ improperly discounted the opinion of a **consulting** physician -- namely, Dr. Greene -- rather than a treating physician.  See, Plaintiff's Memorandum in Support, supra at 9.  Specifically, Dr. Greene concluded that the Plaintiff was only able to walk for fifteen (15) minutes out of an eight (8) hour workday.  [T. 194].  However, the ALJ found that Dr. Greene's opinion was "not consistent with the clinical signs that were present" upon Dr. Greene's examination of the Plaintiff, including Dr. Greene's observation that the Plaintiff had a normal range of motion in his hips and ankles, that he did not require any assistive devices to ambulate, and that he had normal reflexes, sensation, and motor strength, in his extremities.  [T. 19].

The ALJ also found that Dr. Greene's observation was consistent with Dr. Butner's contemporaneous conclusion, that the Plaintiff was ambulating well in normal shoes.  Id.  Accordingly, the ALJ declined to place significant weight on Dr. Greene's conclusory opinion, concerning the Plaintiff's ability to stand, because he found that it was inconsistent with the Record as a whole.  We find that, when the

evidence of Record is viewed in its entirety, those portions of Dr. Greene's opinion, which were rejected by the ALJ, were not supported by substantial evidence.

As previously noted, the ALJ need not give any weight to a consultative, or a treating physician's, conclusory statements regarding total disability.  See, 20 C.F.R. §§404.1527(e)(1), and 416.927(e)(1); Rogers v. Chater, supra at 602.  If justified by substantial evidence in the Record as a whole, the ALJ can discount the examining, or treating physician's opinion.  See, Rogers v. Chater, supra at 602; Ward v. Heckler, supra at 846.  Moreover, the ALJ was entitled to discount Dr. Greene's opinion, based upon its internal inconsistency.  See, Travis v. Astrue, 477 F.3d 1037, 1041-1042 (8th Cir. 2007)(affirming the ALJ's determination to grant the treating physicians' opinions less weight, as internally inconsistent); Hacker v. Barnhart, supra at 937 ("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions."), citing Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000); Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)("[T]he ALJ did not err in discounting the inconsistent and unsupported portions of Dr. Brockman's medical source statement.").

Here, in declining to give substantial weight to Dr. Greene's opinion, the ALJ instead relied upon the opinion of the non-examining State Agency physicians, Dr.

Phibbs and Dr. Mark, who opined that the Plaintiff was able to perform a range of light-duty work.  [T. 20]; see also, 20 C.F.R. §§404.1527(f)(2)(i), and 416.927(f)(2)(i) ("State agency medical and psychological consultants and other program physicians and psychologists are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.").  Specifically, Dr. Phibbs noted that the Plaintiff continued to work after his foot amputation in 1993, including frequently lifting twenty-five (25) pounds, and occasionally lifting fifty (50) pounds.  [T. 238].  Dr. Phibbs also concluded that the Plaintiff could stand, walk, or sit, for six (6) hours out of a normal work day, and that the Plaintiff did not suffer any limitations in his ability to communicate, manipulate, or reach.  [T. 238-241].  Despite the Plaintiff's claim that his symptoms had worsened, Dr. Phibbs noted that the Plaintiff's examinations, in November of 2004, had not disclosed any significant change in his condition.  [T. 252].

In addition, the ALJ relied upon the statements of Dr. Butner, who was the Plaintiff's treating physician, as to the Plaintiff's chronic pain.  [T. 18].  The ALJ noted Dr. Butner's clinical notation, in November of 2004, that the Plaintiff was ambulating well, and that the Plaintiff's "symptoms seemed to be greater than his physical exam would indicate."  Id.  In addition, in early 2005, Dr. Butner reported

- 46 -

that the Plaintiff experienced leg swelling, but only briefly, and that the Plaintiff was doing well on his medications.  Id.  Indeed, as noted by the ALJ, by early 2006, the Plaintiff informed Dr. Butner that he had experienced a remarkable improvement in his pain.  [T. 19].

As with Dr. Greene, however, the ALJ rejected Dr. Butner's conclusory opinion, that the Plaintiff was severely disabled by his degenerative arthritis and osteoporosis, after finding that opinion to be inconsistent with Dr. Butner's findings and observations, over the course of his treatment of the Plaintiff. Id.  The ALJ further noted that Dr. Butner had earlier opined that the Plaintiff was capable of performing work, so long as it did not require heavy lifting or protracted standing or walking.  Id.

Lastly, the ALJ recounted the Plaintiff's testimony, in which he attested that he was able to walk for ten (10) minutes out of every hour, and that he performed all of the household chores, including "vacuuming, cleaning, cooking, some mowing and snow removal, dishes, laundry, and caring for two cats[.]"  [T. 16-18].  In addition, despite the Plaintiff's testimony that his hip pain was more disabling than his partially amputated foot, the ALJ noted that the Plaintiff "has sought treatment for hip pain only sporadically, which suggests that he has not experienced frequent and persistent hip pain severe enough to prevent him from maintaining regular work attendance."

[T. 18].  Accordingly, the ALJ concluded that the Plaintiff's statements, concerning the disabling effects of his symptoms, were not entirely credible.  Id.[21]

Our Court of Appeals has "allowed an ALJ to substitute the opinions of non-treating physicians in several instances, including where a treating physician 'renders inconsistent opinions that undermine the credibility of such opinions.'"  Hacker v. Barnhart, supra at 937, quoting Prosch v. Apfel, supra at 1013, and citing Goetz v. Barnhart, 182 Fed.Appx. 625, 626, 2006 WL 1512176 (8th Cir., June 2, 2006); see also, Reed v. Barnhart, 399 F.3d 917, 920-921 (8th Cir. 2005).  In a recent case, the Court affirmed the ALJ's decision to discount the opinion of a treating physician, who limited the plaintiff to standing no more than four (4) hours out of an eight (8) hour workday, in favor of the opinions of several consulting physicians.  See, Charles v. Barnhart, 375 F.3d 777, 782 (8th Cir. 2004).  The Court acknowledged that "[g]enerally, if a consulting physician examines a claimant only once, his or her opinion is not considered substantial evidence, especially if the treating physician contradicts the consulting physician's opinion."  Id. at 783 [citations omitted]; see also, Cox v. Barnhart, 345 F.3d 606, 610 (8th Cir. 2003)("[T]he results of a one-time

---

[21]The Plaintiff has not argued that the ALJ improperly discounted his subjective complaints.

medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision."). Nonetheless, the Court found that the treating physician's opinion was not supported by substantial evidence, reasoning as follows:

> Given this evidence, Dr. Rock's assessment of [the plaintiff's] inability to stand no more than four hours a day is not supported by substantial evidence. None of Dr. Rock's records following [the plaintiff's] onset date note any such restrictions. Furthermore, the history of [the plaintiff's] back and arthritis problems indicates that her condition was controlled mostly with medication and some restriction on her daily activities. However, Dr. Rock never reported any severe problems, particularly any restrictions for standing and walking. Dr. Rock's opinion was conclusory and unsupported by medical findings. The consultative physicians relied upon objective test results. Therefore, the ALJ had discretion to rely on the consulting physicians' opinions to determine [the plaintiff's] limitations. Here, these physicians determined that [the plaintiff] could stand for at least six hours in a work day, thus placing her in the light exertional work category.

Id. at 784.

We find the circumstances, here, to be closely analogous, and we conclude that the ALJ properly exercised his discretion to discount that portion of Dr. Greene's opinion which was inconsistent with the Record as a whole. Notwithstanding the Plaintiff's assertions to the contrary, the Record demonstrates that "the ALJ's determination to grant [Dr. Greene's] opinion less weight is supported by more than a one-time medical

- 49 -

evaluation and is supported by medical evidence." Travis v. Astrue, supra at 1042; see also, Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002)("[T]he ALJ did not rely solely on the opinion of the consulting physician, but also conducted an independent review of the medical evidence.").

Under the circumstances, here, we find that the ALJ fulfilled his responsibilities under the Regulations, by explaining, and justifying, the weight that was given to each of the medical source opinions, by cogently detailing why he found some opinions more persuasive than others. See, 20 C.F.R. §§404.1527(f)(2)(ii), and 416.927(f)(2)(ii). We are mindful that the ALJ was confronted with competing and conflicting medical opinions, as professed by consultative, and treating physicians, and, under those circumstances, the ALJ's obligation is to weigh the competing evidence, and draw findings based upon the substantial weight of the evidence of Record.

Consistent with his "function to resolve conflicts among the various treating and examining physicians," Tindell v. Barnhart, 444 F.3d 1002, 1004 (8th Cir. 2006), quoting Vandenboom v. Barnhart, supra at 749-50, we find that the ALJ thoroughly reviewed the entirety of the Record, and based his resolution of the medical disputes on substantial evidence. We do not suggest that, were we to consider the matter as

one of first impression, we would have reached the same result, for we simply acknowledge that the resolution that the ALJ reached was well within the Commissioner's "zone of choice." See, Vandenboom v. Barnhart, supra at 749, citing, and quoting, Eichelberger v. Barnhart, supra at 589.

In sum, where, as here, medical evidence conflicts, the obligation of the ALJ is to consider "all of the medical evidence, * * * weigh[] this evidence in accordance with the applicable standards, and attempt[] to resolve the various conflicts and inconsistencies in the record." Hudson ex. rel. Jones v. Barnhart, 345 F.3d 661, 667 (8th Cir. 2003). After close review, we are convinced that the ALJ properly weighed the medical opinions in the Record, and afforded those opinions the weight they deserved when considered on the Record as a whole. See, Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1995)("It is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'"), quoting Cabrnoch v. Bowen, 881 F.2d 561, 564 (8th Cir. 1989).

Accordingly, we reject the Plaintiff's contention that the ALJ's decision was not supported by substantial evidence, given his decision to discount Dr. Greene's opinion. See, Krogmeier v. Barnhart, supra at 1024 (finding substantial evidence to support the ALJ's decision, where "the ALJ considered the medical records, the

contemporaneous opinion of Dr. Varner, the opinion of the consulting physician, * * * and [the plaintiff's] testimony regarding his daily activities in determining that [the plaintiff] was capable of some work.").  As a result, we find no basis for the Plaintiff's assertion that the ALJ improperly substituted his own opinions for those of a physician, and we find that the ALJ's determination was supported by substantial evidence in the Record as a whole.

       2.    <u>Whether the Hypothetical Propounded to the VE Was Improper</u>.

       a.    <u>Standard of Review</u>.  In determining the Plaintiff's RFC, and in framing an appropriate hypothetical for a VE, the ALJ need only include the limitations he accepted, as supported by substantial evidence.  See, <u>Lacroix v. Barnhart</u>, 465 F.3d 881, 889 (8th Cir. 2006); <u>Hunt v. Massanari</u>, 250 F.3d 622, 625 (8th Cir. 2001); <u>Pertuis v. Apfel</u>, 152 F.3d 1006, 1007 (8th Cir. 1998); <u>Rappoport v. Sullivan</u>, 942 F.2d 1320, 1323 (8th Cir. 1991).  However, when an ALJ finds that a Plaintiff suffers from impairments, the hypothetical posed to the VE must include those impairments. See, <u>Brachtel v. Apfel</u>, 132 F.3d 417, 421 (8th Cir. 1997); <u>Newton v. Chater</u>, 92 F.3d 688, 694-95 (8th Cir. 1996)("A hypothetical question must precisely describe a claimant's impairments so that the vocational expert may accurately assess

whether jobs exist for the claimant."), citing <u>Smith v. Shalala</u>, 31 F.3d 715, 717 (8th Cir. 1994); <u>Stout v. Shalala</u>, 988 F.2d 853, 855 (8th Cir. 1993).

The facts in the hypothetical are designed to replicate the Plaintiff's RFC, so as to allow the VE to identify jobs in the economy, if any there be, which an individual, with functional limitations like those of the Plaintiff, would be able to perform.   See, <u>Nelson v. Sullivan</u>, 946 F.2d 1314, 1317 (8th Cir. 1991); <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991).   Moreover, it is well-settled that the testimony of a VE, which is based upon a properly-phrased hypothetical question, constitutes substantial evidence.   See, e.g., <u>Howard v. Massanari</u>, supra at 582; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1049 (8th Cir. 1999); <u>Porch v. Chater</u>, 115 F.3d 567, 571 (8th Cir. 1997).   In order to rely upon a VE's opinion, however, the hypothetical posed "must fully set forth a claimant's impairments." <u>Sullins v. Shalala</u>, 25 F.3d 601, 604 (8th Cir. 1994), citing <u>Totz v. Sullivan</u>, 961 F.2d 727, 730 (8th Cir. 1992).

   b. <u>Legal Analysis</u>.   The Plaintiff argues that the ALJ's hypothetical was flawed, based upon his general contention that the ALJ improperly determined his RFC.   Although the Plaintiff fails to identify any specific deficiency in the ALJ's formulation of the RFC, we understand the Plaintiff to argue that the ALJ

failed to include Dr. Greene's opinion, concerning the Plaintiff's limited ability to stand. See, Plaintiff's Memorandum in Support, supra at 10. "This argument fails, however, in light of our holding that the ALJ properly rejected [Dr. Greene's] opinion in favor of other substantial medical evidence." Prosch v. Apfel, supra at 1015.

Moreover, we have already determined that the ALJ thoroughly reviewed the Record, so as to ascertain that the Plaintiff's symptoms from his physical impairments, including his partially amputated foot, degenerative arthritis, osteoporosis, and alcohol dependence, were insufficient to render the Plaintiff disabled.[22]  Therefore, it was appropriate for the ALJ to only include, in his hypothetical to the VE, the limitations that he determined to be supported by substantial evidence. See, Pertuis v. Apfel, supra at 1007; Rappoport v. Sullivan, supra at 1323.

The hypothetical posed to the VE included the Plaintiff's age, education, and physical and mental work-related limitations, which were consistent with the Record: namely, unskilled, entry-level work limited to light exertion, due to severe impairment by a partially amputated foot, osteoporosis, and degenerative arthritis which caused hip pain, lifting no more ten (10) pounds frequently and twenty (20) pounds

---

[22]Again, the Plaintiff has not raised any challenge to the ALJ's conclusions concerning his alleged mental impairments.

occasionally, and requiring a sit/stand option and a position change every twenty (20) to thirty (30) minutes, in an environment free from dusts, fumes, gases, smoke, alcohol, and drugs.  [T. 314-316].  The VE testified that the hypothetical individual, who was subject to such limitations, could not perform the Plaintiff's past relevant work, but could perform a range of positions, which existed in significant numbers in the national economy, including bander/cellophaner, wrapping machine operator, and poly-packer/heat sealer.  [T. 317-318].

Accordingly, the ALJ's finding, that the Plaintiff was not disabled because he was capable of performing work which existed in the national economy, was supported by substantial evidence in the Record as a whole.  See, Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999)("A hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.'"), quoting Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985); Andres v. Bowen, 870 F.2d 453, 455 (8th Cir. 1989).

3.    The ALJ Improperly Relied upon the Testimony of the Vocational Expert.

Lastly, the Plaintiff contends that the VE's opinion -- which the ALJ subsequently adopted as part of his decision -- that the Plaintiff could perform

- 55 -

a range of available jobs, such as bander/cellophaner, wrapping machine operator, and poly-packer/heat sealer, was not supported by substantial evidence. Specifically, the Plaintiff notes that the United States Department of Labor's Dictionary of Occupational Titles ("DOT") classifies the jobs, which were identified by the VE, as requiring skills beyond his vocational limitations.

        a.    <u>Standard of Review</u>. It is well-settled that, "[w]hen expert testimony conflicts with the DOT, and the DOT classifications are not rebutted, the DOT controls." <u>Porch v. Chater</u>, supra at 572; see also, <u>Montgomery v. Chater</u>, 69 F.3d 273, 276 (8th Cir. 1995); <u>Smith v. Shalala</u>, 46 F.3d 45, 47 (8th Cir. 1995). However, definitions of particular jobs in the DOT represent approximate, maximum requirements for each position. See, <u>Young v. Apfel</u>, 221 F.3d 1065, 1070 (8th Cir. 2000). Thus, the DOT classifications may be rebutted with VE testimony which shows that a particular job might be of a type that the claimant could perform. See, <u>Montgomery v. Chater</u>, supra at 276. As our Court of Appeals has explained:

> [The claimant's] "reliance on the DOT as a definitive authority on job requirements is misplaced, however, for DOT definitions are simply generic job descriptions that offer the appropriate maximum requirements for each position, rather than their range." Hall v. Chater, 109 F.3d 1255, 1259 (8th Cir. 1997)(internal citations omitted). The DOT itself cautions that descriptions may not coincide in

- 56 -

> every respect with the contents of jobs as performed in
> particular establishments or at certain localities, Hall, 109
> F.3d at 1259 * * *.  In other words, not all of the jobs in
> every category have requirements identical to or as rigorous
> as those listed in the DOT.  Hall, 109 F.3d at 1259.

Wheeler v. Apfel, 224 F.3d 891, 897(8th Cir. 2000); see also, Hillier v. Social Security Administration, 486 F.3d 359, 366-367 (8th Cir. 2007); Page v. Astrue, 484 F.3d 1040, 1045 (8th Cir. 2007)(citing same).

Necessarily, we apply this binding authority to the Plaintiff's argument.

      b.    Legal Analysis.  The ALJ's prescribed RFC assumed that the Plaintiff was limited to simple, unskilled, entry-level work.  [T. 17].  The Plaintiff argues that, according to the DOT, the occupations that were identified by the VE -- namely, bander/cellophaner, wrapping machine operator, and poly-packer/heat sealer -- require a reasoning development of level two.  See, Plaintiff's Memorandum in Support, supra at 11.  The Plaintiff claims that a limitation to simple, unskilled work, by contrast, is consistent with the DOT's description of a reasoning development level of one.  Id.  Therefore, the Plaintiff maintains that the ALJ erred in concluding that he could perform those jobs, because they are supposedly at variance with the DOT's listing for those positions.  We disagree.

In support of his argument, the Plaintiff cites Lucy v. Chater, 113 F.3d 905, 907-908 (8th Cir. 1997).  There, the ALJ concluded, without consulting a VE, that the

plaintiff's borderline intellectual functioning did not prevent him from "following simple instructions, doing assigned tasks, or relating appropriately to others." Id. Our Court of Appeals reversed and remanded, based upon its conclusion "that borderline intellectual functioning, if supported by the record as it is here, is a significant nonexertional impairment that must be considered by a vocational expert." Id. at 908 [citations omitted]. The Court further held that the plaintiff was "entitled to have a vocational expert consider this condition along with his other impairments to determine how it impacts upon [the plaintiff's] residual functional capacity." Id. at 909.

Here, unlike the plaintiff in Lucy, there is no evidence that the Plaintiff suffered from borderline intellectual functioning, and the ALJ specifically concluded that the Plaintiff's alleged depression was not severe, and did not constitute a medically determinable mental impairment -- a finding which the Plaintiff has not disputed.[23]

_____

[23]Similarly, the other cases cited by the Plaintiff are inapposite to the circumstances presented here, as they involved plaintiffs who suffered from borderline intellectual functioning. See, Swope v. Barnhart, 436 F.3d 1023, 1024 (8th Cir. 2006)(reversing the ALJ's determination, where the ALJ's hypothetical to the VE failed to reference the plaintiff's borderline intellectual functioning); Titus v. Callahan, 133 F.3d 561, 562 (8th Cir. 1997)(reversing the ALJ's determination that the plaintiff could perform clerical work, because the Record did not support a finding that she had the mathematical, reasoning, or language skills to perform the requisite duties).

[T. 17].  During his consultative examination with Dr. Carter, the Plaintiff reported

that he read books, and that he did not have any difficulty getting along with others.

Id.  In addition, Dr. Carter observed that the Plaintiff was fully oriented, with a good

attention span and good memory function, and Dr. Carter opined that the Plaintiff did

not suffer any impairment in his ability to understand, retain, and follow instructions,

nor did he have any impairment in his ability to tolerate the stress of simple, unskilled

work.  Id.  Indeed, the ALJ relied upon Dr. Carter's observation in concluding that the

Plaintiff suffered only mild restrictions in his ability to maintain concentration,

persistence, and pace.  Id.  Moreover, the ALJ noted that the Plaintiff had previously

performed semi-skilled and skilled work, but that his physical impairments precluded

him from returning to that past relevant work, and that his skills were not transferable

to any light-duty, unskilled work.  [T. 20, 316-317].

In addition, unlike Lucy, the ALJ consulted a VE, in order to competently

ascertain which occupations an individual, who had the Plaintiff's impairments, would

be capable of performing.  In response to the hypothetical posed by the ALJ, the VE

identified three (3) jobs, including their corresponding identification numbers in the

DOT, for which the Plaintiff was suited.  According to the DOT, the reasoning level

for all of those jobs had a level of two -- the second lowest level of reasoning

development.    See, <u>DOT  920.685-014</u>  (bander/cellophaner);  <u>DOT  920.685-030</u>

(wrapping machine operator); <u>DOT 920.686-038</u> (poly-packer/heat sealer).  A level

of two reasoning has the following requirements:

> [The application of] commonsense understanding to carry
> out detailed but uninvolved written or oral instructions.
> Deal with problems involving a few concrete variables in
> or from standardized situations.

<u>DOT, Appendix C</u>.[24]

The ALJ's limitation for the Plaintiff, as to an appropriate reasoning level, was that

he could perform simple, unskilled, entry-level work.  [T. 64, 318].  Therefore, the

DOT's level of two reasoning requirement did not conflict with the ALJ's prescribed

limitation.  Plainly, the VE's testimony did not contradict the ALJ's limitation, when

considered in light of the DOT definitions.  In fact, the VE testified that there was no

discrepancy between his testimony and the DOT.  [T. 21, 319].

---

[24]The  lowest  level  of  reasoning  --  a  level  of  one  --  has  the  following
requirements:

> [The application of] commonsense understanding to carry
> out simple one- or two-step instructions.  Deal with
> standardized situations with occasional or no variables in or
> from these situations encountered on the job.

<u>DOT, Appendix C</u>.

Accordingly, the VE tailored his opinion to include only those jobs which, in his professional opinion, fell within the Plaintiff's RFC, notwithstanding their designation as positions which required reasoning development at a level of two. Upon our close review, we conclude that the VE's opinion was supported by substantial evidence, and consequently, the ALJ did not err in adopting that opinion. See, Hall v. Chater, supra at 1259; Roe v. Chater, supra at 678 n. 8; Carlson v. Chater, 74 F.3d 869, 871 (8th Cir. 1996); Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995). Notably, if as the Plaintiff now portends, there was inherently something wrong in the VE's reliance upon the DOT, or in the VE's estimate of the number of jobs available in the economy, which would satisfy the ALJ's RFC, those errors are neither facially evident, nor supported by any cross examination, or conflicting expert testimony, on the Plaintiff's behalf.

In sum, finding no basis for a reversal of the ALJ's opinion, we recommend that the final decision of the Commissioner be affirmed in all respects.

NOW, THEREFORE, It is --

RECOMMENDED:

1.     That the Plaintiff's Motion [Docket No. 10] for Summary Judgment be denied.

2.      That the Defendant's Motion [Docket No. 17] for Summary Judgment be granted.


Dated:  December 18, 2008                    *s/Raymond L. Erickson*
                                             Raymond L. Erickson
                                             CHIEF U.S.  MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **January 6, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **January 6, 2009**, unless all interested

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.